**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
CAMDEN VICINAGE**

| | |
|---|---|
| UNITED FOOD AND COMMERCIAL WORKERS AND PARTICIPATING FOOD INDUSTRY EMPLOYERS TRI-STATE HEALTH AND WELFARE FUND, et al., | Civil No. 04-1226(RMB) |
| Plaintiffs, | **OPINION** |
| v. | |
| SUPER FRESH FOOD MARKETS INC., et al., | |
| Defendants. | |

Plaintiffs, United Food and Commercial Workers Union and Participating Food Industry Employers Tri-State Health and Welfare Fund, Brian String and John Calleri, as trustees and fiduciaries of the United Food and Commercial Workers Union and Participating Food Industry Employers Tri-State Health and Welfare Fund, (hereinafter referred to collectively as "Tri-State" or the "Fund"), allege that the Defendants, Super Fresh Food Markets, Inc., ("Super Fresh") and the Great Atlantic and Pacific Tea Company, Inc., ("A&P") have failed to pay the Fund the full amount for retiree medical coverage from May 2003 to the present and, by failing to pay, are in violation of Section 515 of ERISA, 29 U.S.C. § 1145. Plaintiffs also aver that this failure to pay constitutes a prohibited transaction as described

in Section 406(a)(1)(B) of ERISA, 29 U.S.C. § 1106(a)(1)(B).
Moreover, Plaintiffs allege that the Defendants are jointly and
severally liable to pay all retiree contributions due and owing
to the Fund as Super Fresh and A&P constitute a single common
enterprise and/or a single employer for purposes of remitting
retiree contributions to the Fund, such that Super Fresh is
responsible for A&P's retiree contributions.

In a prior summary judgment ruling, this Court found that it
was presented with four disputed issues: 1) whether A&P or Super
Fresh is obligated to contribute for the benefits provided their
retirees; 2) whether the cost of A&P's retirees can be allocated
to Super Fresh because both entities are in fact a single
employer; 3) whether A&P is obligated to contribute for the
benefits of its retirees despite having no active employees; and,
4) whether the agreement regarding the return of Super Fresh's
employees, including retirees, that were members of United Food
and Commercial Workers (hereinafter "UFCW") Union Local 27 from
the UFCW Local 56 Fund, included Local 27 members who were former
A&P employees.  In the oral opinion addressing the motion, this
Court found that it only needed to reach the first two questions
at that time because, as the opinion stated, "judgment for the
[D]efendants on the first two questions [was] premature at [that]
point." Op. Tr. at 10:6-8.

As to the first two questions, this Court found that the

2

CBAs at issue were ambiguous, in part, because the CBAs appear to cover retiree benefits, but are silent as to whether those benefits are for current or future retirees.  Id. at 13:9-25. Moreover, the CBAs do not define the terms employee or associate and use both terms at different items and intermittently refer to "active employees."  Thus, despite the Defendants' contention that retiree coverage was precluded, the Court found that there was ambiguity on this point sufficient to create a material issue of fact.  This Court also held that there were issues of material fact that precluded summary judgment as to whether A&P and Super Fresh constitute a single entity for purposes of retiree benefits contributions.  Id. at 15:2-5.

At this current stage, there are several issues remaining that have been more clearly defined by the parties in their pre-trial submissions: 1) whether the CBAs at issue contain a method for employer contributions to the Fund; 2) whether the Trustees had the authority to change the contribution methodology in 2003; 3) if that methodology change was permissible, are A&P and Super Fresh considered a single entity (as a joint employer or alter ego) for purposes of contribution liability; and, 4) whether former A&P retirees were transferred back to the Fund as part of the move from the Local 56 Fund.[1]

---

[1]  Following a long colloquy with the Court, Plaintiffs' counsel made clear that it was not pursuing a withdrawal liability claim against A&P; i.e., it was not arguing that A&P,

This Court held a bench trial on these issues on November, 14 and 15, 2007, December 10-12, 2007, May 6, 7, 9, 2008, May 12-16, 2008, May 27 and 28, 2008, and June 11, 12, 13, 16, 17, 24, 2008.[2]  On July 21, 2008, the parties submitted their respective "Proposed Findings of Fact and Conclusions of Law."  The following, presented pursuant to Federal Rule of Civil Procedure 52, constitutes this Court's Findings of Fact and Conclusions of Law.  While not required, this Court will set forth the most relevant of the parties' stipulated facts in its findings because these facts are necessary to understand this Court's ultimate Findings.[3]

**I.**   **Findings of Fact**

   ***A. Background of the Fund and Trust Agreement***

1.    The Tri-State Fund is a multiemployer trust fund which

---

as a Fund settlor, could not withdraw from the Fund and cease making contributions.  Trial Tr. 5/12/08 1848:3-1856:12; 1953:-1957:5; 5/13/08 1987:6-16.

   [2] For ease of administration, this Court divided the trial proceedings in order to handle the issues presented in a logical fashion.  On December 10, 2007, the Court found that it would first address the legality of the change in methodology and, if it found that such a change was lawful, the Court would then, and only then, address the reasonableness of the change and the entity status of A&P and Super Fresh.  Trial Tr. 12/10/07 489:9-21.

   [3] These facts are drawn from the parties' stipulated facts as submitted in the Pre-Trial Order [Docket No. 111] as amended by the parties' consent order [Docket No. 136].

provides health and welfare benefits to eligible beneficiaries. This plan is subject to the terms of the Employment Retirement and Income Security Act of 1974, "ERISA." Stip. Facts at ¶1.

2.    In addition to being subject to the terms of ERISA, the Fund is subject to Section 302(c)(5) of the Taft-Hartley Act, 29 U.S.C. § 186(c)(5). Stip. Facts at ¶ 5.

3.    The Fund was created in 1966 via execution of a Trust Agreement. A&P was a party to the Trust Agreement and, as an original signatory, is a settlor of the Fund. Stip. Facts at ¶¶ 2 & 3; P-38.

4.    The Trust Agreement which governs the Fund was Restated in 1980 ("the Restated Trust Agreement"). Stip. Facts at ¶ 32.

5.    Defendant A&P was an original signatory to the 1980 Restated Trust Agreement. Stip. Facts at ¶ 33.

6.    Super Fresh was created in 1982 as a wholly owned subsidiary of A&P. Stip. Facts at ¶ 6.

7.    Employers who were not original signatories to the Trust could participate in the Trust by signing a participation agreement. Trial Tr. Vaccaro 12/11/07 767:25-768:3.

8.    A participation agreement would be signed for each employer and union on whose behalf that employer would make contributions to the Fund. Trial Tr. Vaccaro 12/11/08 768:4-21.

9.    In 1994, Super Fresh executed three separate participation agreements with three separate union locals: UFCW Local 27, UFCW

Local 1358, and UFCW 1360.  P-132; Trial Tr. Vaccaro 12/11/07
769:16-24.

10.    In 1998, A&P signed a participation agreement with UFCW
Local 1360.  P-132.

11.    Pursuant to these three participation agreements, Super
Fresh agreed to make contributions as required under its
collective bargaining agreement or successor agreement with each
union. Trial Tr. Vaccaro 12/11/07 770:20-25.

12.    Pursuant to its participation agreement, A&P agreed to
make contributions as required under its collective bargaining
agreement or successor agreement with Local 1360.  P-132.

13.  Section 4.1 of the Trust Agreement sets forth the Powers
and Duties of the Trustees and makes clear that,

> [i]n operating and administering the Health and Welfare
> Fund and Plan, the Trustees shall, subject to and
> consistent with the applicable provisions of the then
> existing collective bargaining agreements, have the
> power and/or duty:
>
>                 *    *    *
>
> p. To make, adopt, amend or repeal by-laws, rules and
> regulations not inconsistent with the terms of this
> Trust Agreement, as the Trustees may deem necessary or
> desirable for the purpose of the carrying out the
> purpose of this Trust.
>
>                 *    *    *
>
> s.  The Trustees shall construe the terms and
> provisions of this Trust Agreement, the health and
> Welfare Plan and all other supplementary and amendatory
> documents.  The construction adopted by the Trustees in
> good faith shall be binding upon the Employer, the
> Union, the Employees, Participants and all other

6

persons who may be involved or affected.
P-38.

14.    The CBAs at issue in this case are not "supplementary or amendatory documents."  When the Trust document refers to the collective bargaining agreements, it does so directly and makes clear that the Trustees, in discharging their duties, including making rules as laid out in subsection 4.1p or construing the Trust agreement as set forth in 4.1s, must do so **subject to and consistent with** the existent CBA.  P-38 at 11, Section 4.1; Trial Tr. Witt 6/12/08 3980:12-24; 3982:1-18; Vaccaro 11/14/07 94:18-25; 12/11/07 718:4-18; Calleri 5/15/08 2595:3-8.

15.    Section 9.2 of the miscellaneous provisions of the Trust Agreement, which provides that the interpretation of the Trust Agreement and Plan, "shall be binding upon the Union, the Employer as well as upon the Employees . . .," does not change the overarching restriction on the powers and duties of the Trustees contained in section 4.1, i.e. - that the Trustees must carry out that interpretation subject to and consistent with the CBAs.  P-38.

16.    Pursuant to the Trust Agreement, the Trustees could not change or add any obligation that would be inconsistent with the CBAs in place at that time.  P-38 at 11, Section 4.1; Trial Tr. Vaccaro 12/11/07 718:4-18.

17.    All the benefits received by beneficiaries of the Fund are

funded through contributions made by participating employers. Stip. Facts at ¶ 21.

18.    The Fund must provide benefits in accordance with the collective bargaining agreements.  Trial Tr. Vaccaro 11/14/07 68:19-22.

19.    An employer and union, in a collective bargaining agreement, may agree that if the cost of the existing plan of benefits rises above what the initial contribution rate agreed to in the CBA provides, the Trustees may raise the contribution rate in order to maintain the existing level of benefits.  This is referred to as a "maintenance of benefits" provision, commonly abbreviated as "MOB".  Stip. Facts at ¶ 22.

20.    Under an "uncapped" or full MOB provision, the Fund's third-party administrator would annually calculate MOB rates required to maintain the current level of benefits.  If the new annual MOB rate assessed to the participating employer was greater than the rate stated for that year in the CBA, the participating employer was required to pay the higher MOB rate through the contribution year. Stip. Facts at ¶ 23; Trial Tr. Vaccaro 11/14/07 98:1-6.

### B. The Super Fresh Collective Bargaining Agreements

#### i) Local 27

21.    Super Fresh executed a CBA with Local 27, having a term of October 31, 1999 through October 30, 2004.  This CBA contains a

Preamble which states:

> This Agreement made and entered into as of October 31, 1999, by and between SUPER FRESH FOOD MARKETS, INC. (hereinafter referred to as "Employer"), and UNITED FOOD AND COMMERCIAL WORKERS UNION, LOCAL 27 [1358, 1360] (hereinafter referred to as "Union") affiliated with the UNITED FOOD AND COMMERCIAL WORKERS INTERNATIONAL UNION, AFL-CIO.  It is intended and agreed that SUPER FRESH FOOD MARKETS, INC. and THE GREAT ATLANTIC AND PACIFIC TEA COMPANY, INC. (A&P) are different and separate operating retail units and shall be so considered for purposes of this agreement.

Stip Facts at ¶ 14; D-76 at 1.

22.   This "Separateness Preamble" clarifies that Super Fresh and A&P are different bargaining units.  Trial Tr. Rogers 6/16/08 4285:2-5.

23.   The 1999-2004 CBA between Super Fresh and Local 27 governed the terms and conditions of employment of those Super Fresh bargaining unit employees who were represented by Local 27 for purposes of collective bargaining.  Stip. Facts at ¶ 76.

24.   Article 25 of the 1999-2004 CBA between Super Fresh and Local 27 states that the "Employer agrees to participate in and make contributions on behalf of eligible associates to the appropriate Health Plan described in Appendix C."  D-76 at 14, Art. 25.

25.   "Eligible associates" refers to active Super Fresh employees.  Trial Tr. Vaccaro 812:16-24; Witt 6/12/08 3991:15-25.

26.   Appendix C states that "The Employer agrees to contribute to the TRI-STATE HEALTH AND WELFARE FUND as follows:

A.   Full-Time Clerks

    1.  Monthly contributions shall be made for each full-time employee on the payroll as of 10/1/90 commencing with the month following the completion of one (1) year of contributions full time service with the Employer and who is active during the first full week fo each month.  * * *  The coverage for full-time associates indicated shall be as follows:

    Plan I cost/mem/mo 5/1/99 $620.70.

    * * *

    Plan H cost/mem/mo 5/1/00 $439.61.

D-76 at Appx. C & superseding language; Trial Tr. Vaccaro 12/11/07 825:1-25.

27.   "Full-time associates" means full-time employees.  Trial Tr. Vaccaro 12/11/07 822:1-16; Witt 6/12/08 3991:15-25.

28.   It was clear from the language in the 1999-2004 CBA between Super Fresh and Local 27 that Super Fresh was to pay a stated dollar rate multiplied by each of its active employees per month.  Trial Tr. Vaccaro 12/11/07 818:12-17; 825:22-826:1.

29.   "Cost/mem/mo" means cost per member per month.  Cost per member does not mean per retiree.  Trial Tr. Rogers 4302:10-4303:15.

30.   Appendix C contains menus of benefits for Plans I and H. These menus contain, inter alia, entries for "Retiree Rx Drug, Retiree Vision, Retiree Dental. . . ."  D-76.

31.   These menus of benefits illustrate the types of benefits to be provided by the Fund but do not represent a contractual

duty on behalf of Super Fresh to provide particular benefits. Trial Tr. Witt 6/13/08 4050:4-8.

32.    The phrase "coverage for full-time associates indicated shall be as follows" refers to the contribution rate, not the menu of benefits.  Trial Tr. Rogers 4352:5-4353:9.

33.    Retiree benefits were provided under the Super Fresh and Local 27 CBA.  D-76 at 25, Appx. C (A)(1)(1); Trial Tr. Vaccaro 11/15/07 256:9-15; 257:9-16.

34.    The formula for determining the cost of these retiree benefits was not set forth in Appendix C of the Super Fresh - Local 27 contract.  Trial Tr. Vaccaro 12/11/07 826:9-10.

35.    The language of the 1999-2004 CBA between Super Fresh and Local 27 did not require Super Fresh to make a contribution multiplied by the number of its own retirees.  Trial Tr. Vaccaro 12/11/07 825:11-21.

36.    It had been the practice of the Fund, of which the bargaining parties were well aware, to allocate the costs of benefits for all retirees of the Fund as a built-in component of the active rate.  Trial Tr. Vaccaro 12/11/07 831:18-24.

37.    The retiree component was not the direct cost of Super Fresh's own retirees but that an equal share of the total retiree costs for the pool of retirees in the Fund.   Trial Tr. Vaccaro 11/14/07 112:2-7; 113:9-13; 12/11/07 689:24-690:1; 853:18-25; Camp 6/12/08 3939:11-19; Calleri 5/15/08 2462:23-2463:4.

11

38.    The 1999-2004 CBA between Super Fresh and Locals 27
contained "uncapped" or full MOB provisions.  Stip Facts at ¶ 24;
D-76 at 27; Trial Tr. Vaccaro 11/15/07 196:19-20.

39.    Appendix C further provides that "[s]hould the unallocated
surplus relative to total expenses be less than six (6) months,
the MOB amount will be adjusted to re-establish the unallocated
surplus to the equivalent of six (6) months of total expenses."
This is commonly referred to as the "Maintenance of Reserves" or
"MOR" clause.  Stip. Facts at ¶ 26; D-76 at 27.

40.    Appendix C of the CBA between Super Fresh and Local 27
states that "all questions involving Health & Welfare, not
specifically set forth herein, shall be determined by the
provisions of the Agreement and Declaration of Trust governing
the Plan."  Stip. Facts. at ¶ 29; D-76 at 28.

41.    Where a question is unanswered involving Health & Welfare
in the Local 27 CBA, requiring reference to the Agreement and
Declaration of Trust, decisions made pursuant to the Trust
Agreement must still be subject to and consistent with the
existent provisions in the CBA.  P-38 at 11, Section 4.1; Trial
Tr. Witt 6/12/08 3980:12-24.


     ii) *Local 1358*

42.    Super Fresh executed a CBA with Local 1358 having a term
of October 31, 1999 through October 30, 2004.  This CBA contains

12

a Preamble which states:

> This Agreement made and entered into as of October 31,
> 1999, by and between SUPER FRESH FOOD MARKETS, INC.
> (hereinafter referred to as "Employer"), and UNITED
> FOOD AND COMMERCIAL WORKERS UNION, LOCAL 27 [1358,
> 1360] (hereinafter referred to as "Union") affiliated
> with the UNITED FOOD AND COMMERCIAL WORKERS
> INTERNATIONAL UNION, AFL-CIO.  It is intended and
> agreed that SUPER FRESH FOOD MARKETS, INC. and THE
> GREAT ATLANTIC AND PACIFIC TEA COMPANY, INC. (A&P) are
> different and separate operating retail units and shall
> be so considered for purposes of this agreement.

Stip. Facts at 14; P-151 at 1.

43.    This "Separateness Preamble" confirms that Super Fresh and
A&P are different bargaining units.  Trial Tr. Rogers 4344:4-20.

44.    The 1999-2004 CBA between Super Fresh and Local 1358
governed the terms and conditions of employment of those Super
Fresh bargaining unit employees who were represented by Local
1358 for purposes of collective bargaining.  Stip. Facts at ¶ 75.

45.    Article 25 of the 1999-2004 CBA between Super Fresh and
Local 1358 states that "The Employer agrees to participate in and
make contributions on behalf of eligible associates to the
appropriate Health Plan described in Appendix 'C'."  P-151 at 19.

46.    "[E]ligible associates" refers to active employees of
Super Fresh.  Trial Tr. Vaccaro 12/11/07 790:2-9; Witt 6/12/08
3991:15-25.

47.    Appendix C states that "The Employer agrees to contribute
to the TRI-STATE HEALTH AND WELFARE FUND as follows:

A.    <u>Full-Time Clerks</u>

> 1.   Monthly contributions shall be made for each full-time employee on the payroll as of 10/1/90 commencing with the month following completion of one (1) year of continuous full-time service with the Employer and who is active during the first full week of each month. * * * The coverage for full-time associates indicated shall be as follows:
>
> Plan I cost/mem/mo 5/1/99 $565.29.
>
> * * *
>
> Plan H cost/mem/mo 5/1/00 $386.78.

P-151 at Appx. C.

48.   "Full-time associates" means full-time employees.  Trial Tr. Vaccaro 12/11/07 822:1-16; 828:13-24; Witt 6/12/08 3991:15-25.

49.   It was clear from the language in the 1999-2004 CBA between Super Fresh and Local 1358 that Super Fresh was to pay a stated dollar rate multiplied by each of its active employees per month.  P-151; Trial Tr. Vaccaro 12/11/07 790:22-791:9.

50.   "Cost/mem/mo" means cost per member per month.  Cost per member does not mean per retiree.  Trial Tr. Rogers 4347:22-4348:6.

51.   Appendix C contains menus of benefits for Plans I and H. These menus contain, inter alia, entries for "Retiree Rx Drug, Retiree Vision, Retiree Dental. . . ."  P-151; Trial Tr. Vacarro 112:16-23.

52.   These menus of benefits illustrate the types of benefits to be provided by the Fund but do not represent a contractual

duty on behalf of Super Fresh to provide particular benefits. Trial Tr. Witt 6/13/08 4050:4-8.

53.    The phrase "coverage for full-time associates indicated shall be as follows" refers to the contribution rate, not the menu of benefits." Trial Tr. Rogers 4352:5-4353:9.

54.    Retiree benefits were provided under the Super Fresh and Local 1358 CBA.  P-151 at 26, Appx. C (1)(A)(1); Trial Tr. Vaccaro 11/14/07 108:13-18; 262:25-263:3.

55.    The formula for determining the cost of these retiree benefits was not set forth in Appendix C of the Super Fresh - Local 1358 contract.  Trial Tr. Vaccaro 11/14/07 159:7-9.

56.    The language of the 1999-2004 CBA between Super Fresh and Local 1358 did not require Super Fresh to make a specific contribution at a stated dollar rate multiplied by its own retirees.  Trial Tr. Vaccaro 12/11/07 793:20-24.

57.    It had been the practice of the Fund, of which the bargaining parties were well aware, to allocate the costs of benefits for all retirees of the Fund as a built-in component of the active rate.  Trial Tr. Vaccaro 12/11/07 793:3-12; 796:2-13.

58.    The retiree component was not the direct cost of Super Fresh's own retirees but that an equal share of the total retiree costs for the pool of retirees in the Fund.  Trial Tr. Vaccaro 11/14/07 112:2-7; 113:9-13; 12/11/07 689:24-690:1; 853:18-25; Camp 6/12/08 3939:11-19; Calleri 5/15/08 2462:23-2463:4.

15

59.   The 1999-2004 CBA between Super Fresh and Local 1358 contained "uncapped" or full MOB provisions.  P-151 at 27.

60.   Appendix C further provides that "Should the unallocated surplus relative to total expenses be less than six (6) months, the MOB amount will be adjusted to re-establish the unallocated surplus to the equivalent of six (6) months of total expenses." This is commonly referred to as the "Maintenance of Reserves" or "MOR" clause.  Stip. Facts at ¶ 26; P-151 at 27.

61.   Appendix C of the CBA between Super Fresh and Local 1358 states that "all questions involving Health & Welfare, not specifically set forth herein, shall be determined by the provisions of the Agreement and Declaration of Trust governing the Plan."  Stip. Facts. at ¶ 29; P-151 at 28.

62.   Where a question is unanswered involving Health & Welfare in the Local 1358 CBA, requiring reference to the Agreement and Declaration of Trust, decisions made pursuant to the Trust Agreement must still be subject to and consistent with the existent provisions in the CBA.  P-38 at 11, Section 4.1; Trial Tr. Witt 6/12/08 3980:12-24.


**iii) *Local 1360***

63.   Super Fresh executed a CBA with Local 1360 having a term of October 31, 1999 through October 30, 2004.  This CBA contains a Preamble which states:

> This Agreement made and entered into as of October 31,
> 1999, by and between SUPER FRESH FOOD MARKETS, INC.
> (hereinafter referred to as "Employer"), and UNITED
> FOOD AND COMMERCIAL WORKERS UNION, LOCAL 27 [1358,
> 1360] (hereinafter referred to as "Union") affiliated
> with the UNITED FOOD AND COMMERCIAL WORKERS
> INTERNATIONAL UNION, AFL-CIO.  It is intended and
> agreed that SUPER FRESH FOOD MARKETS, INC. and THE
> GREAT ATLANTIC AND PACIFIC TEA COMPANY, INC. (A&P) are
> different and separate operating retail units and shall
> be so considered for purposes of this agreement.

Stip Facts. at ¶ 14; P-129 at 1.

64.   This "Separateness Preamble" confirms that Super Fresh and A&P are different bargaining units.  Trial Tr. Rogers 4376:5-12.

65.   The 1999-2004 CBA between Super Fresh and Local 1360 governed the terms and conditions of employment of those Super Fresh bargaining unit employees who were represented by Local 1360 for purposes of collective bargaining.  Stip. Facts at ¶ 74.

66.   Article 25 of the 1999-2004 CBA between Super Fresh and Local 1360 states that "The Employer agrees to participate in and make contributions on behalf of eligible associates to the appropriate Health Plan described in Appendix 'C'."  P-129 at 18, Art. 25.

67.   "Eligible associates" refers to active Super Fresh employees.  Trial Tr. Vaccaro 12/11/07 812:16-24; Witt 6/12/08 3991:15-25.

68.   Appendix C provides, in relevant part, that "The Employer agrees to contribute to the TRI-STATE HEALTH AND WELFARE FUND as follows:

> Monthly contributions shall be made for each full-time
> employee on the payroll as of 10/1/90 commencing with
> the month following completion of one (1) year of
> continuous full-time service with the Employer and who
> is active during the first full week of each month. * *
> * The coverage for full-time associates indicated shall
> be as follows:
>
> Plan I cost/mem/mo 5/1/99 $567.41.
>
> *     *     *
>
> Plan H cost/mem/mo 5/1/00 $388.10."

P-129 at 25, Appx. C.

69.    "Full-time associate" means full-time employees.  Trial

Tr. Vaccaro 12/11/07 822:1-16; Camp 6/12/08 3818:8-24; 3820:15-

18.

70.    It was clear from the language in the 1999-2004 CBA

between Super Fresh and Local 1360 that Super Fresh was to pay a

stated dollar rate multiplied by each of its active employees per

month.  Trial Tr. Vaccaro 12/11/07 818:12-17; 825:22-826:1.

71.    "Cost/mem/mo" means cost per member per month.  Cost per

member does not mean per retiree.  Trial Tr. Rogers 4380:15-

4382:2.

72.    Appendix C contains menus of benefits under Plan I and

Plan H including, inter alia, Retiree Ex Drug and Retiree Vision.

P-129 at 24-25, Appx. C.

73.    These menus of benefits illustrate the types of benefits

to be provided by the Fund but do not represent a contractual

duty on behalf of Super Fresh to provide particular benefits.

Trial Tr. Witt 6/13/08 4050:4-8.

74.    The phrase "coverage for full-time associates indicated shall be as follows" refers to the contribution rate, not the menu of benefits." Trial Tr. Rogers 4352:5-4353:9.

75.    Retiree benefits were provided under the Super Fresh and Local 1360 CBA.  P-129 at 24, Appx. C (1)(a); Trial Tr. Vacarro 112:16-23; 262:25-263:3.

76.    The formula for determining the cost of these retiree benefits was not set forth in Appendix C of the Super Fresh - Local 1360 contract.  Trial Tr. Vaccaro 12/11/07 826:9-10.

77.    The CBA did not state that Super Fresh had to make a contribution multiplied by the number of its own retirees.  Trial Tr. Vaccaro 12/11/07 825:11-21.

78.    It had long been the practice of the Fund, of which the bargaining parties were well aware, to allocate the costs of benefits for all retirees of the Fund as a built-in component of the active rate.  Trial Tr. Vaccaro 12/11/07 793:3-12; 796:2-13.

79.    The retiree component was not the direct cost of Super Fresh's own retirees but that an equal share of the total retiree costs for the pool of retirees in the Fund.  Trial Tr. Vaccaro 11/14/07 112:2-7; 113:9-13; 12/11/07 689:24-690:1; 853:18-25; Camp 6/12/08 3939:11-19; Calleri 5/15/08 2462:23-2463:4..

80.    The 1999-2004 CBA between Super Fresh and Local 1360 contained "uncapped" or full MOB provisions.  P-129 at 26.

19

81.    Appendix C further provides that "Should the unallocated surplus relative to total expenses be less than six (6) months, the MOB amount will be adjusted to re-establish the unallocated surplus to the equivalent of six (6) months of total expenses." This is commonly referred to as the "Maintenance of Reserves" or "MOR" clause.  Stip. Facts at ¶ 26; P-129 at 27.

82.    Appendix C in the CBA between Super Fresh and UFCW Local 1360 contains a clause which directs that "there will be no elimination or reduction in benefits to make up any shortfall in the Employer contribution relative to the required MOB." Stip. Facts at ¶ 31; P-129 at 27.

83.    Appendix C of the CBA between Super Fresh and Local 1360 states that "all questions involving Health & Welfare, not specifically set forth herein, shall be determined by the provisions of the Agreement and Declaration of Trust governing the Plan."  Stip. Facts. at ¶ 29; P-129 at 27.

84.    Where a question is unanswered involving Health & Welfare in the Local 1360 CBA, requiring reference to the Agreement and Declaration of Trust, decisions made pursuant to the Trust Agreement must still be subject to and consistent with the existent provisions in the CBA.  P-38 at 11, Section 4.1; Trial Tr. Witt 6/12/08 3980:12-24.

**C.    *The A&P Collective Bargaining Agreement***

      ***i) Local 1360***

85.   UFCW 1360 entered into a CBA with Defendant A&P effective for the period of June 25, 2000 through June 18, 2005.  Stip. Facts at ¶ 16; P-128.

86.   The A&P/Local 1360 CBA does not contain the Separateness Preamble. Stip Facts at ¶ 17; P-128.

87.   The 2000-2005 CBA between A&P and Local 1360 governed the terms and conditions of employment of those A&P bargaining unit employees who were represented by Local 1360 for purposes of collective bargaining. Stip. Facts at ¶ 73.

88.   The CBA between A&P and Local 1360 contains a Health and Welfare provision at Article 21. Stip. Facts at ¶ 19; P-128 at 20.

89.   The 2000-2005 CBA between A&P and Local 1360 governed the terms and conditions of employment of those A&P bargaining unit employees who were represented by Local 1360 for purposes of collective bargaining.  Stip. Facts at ¶ 73.

90.   Neither the word "retiree" nor the phrase "retiree benefits" appear in the Health and Welfare provision of the A&P/Local 1360 CBA.  Stip Facts. at ¶ 20; P-128.

91.   Article 21 of the A&P and Local 1360 CBA sets forth the A&P's contribution obligation to the Fund, in relevant part, as follows:

<u>PLAN I</u>

Monthly contributions shall be made for each full-time employee, commencing with the month following

21

completion of six (6) months of continuous full-time
service with the Employer who is active during the
first full week of that fiscal month.

              *     *     *

PLAN H

Full-time employees hired or promoted to full-time on
or after June 23, 1996, shall have monthly contribution
made on their behalf commencing with the month
following completion of one (1) year of employment.

P-128 at 20.

92.    "Full-time employees" did not include retirees.  Trial Tr.
Vaccaro 12/11/07 860:3-6.

It is clear from the plain language of the A&P-Local 1360 CBA
that the employer was required to make a contribution only per
each full-time and active employee.  P-128 at 20, Art. 21; Trial
Tr. Vaccaro 12/11/07 847:16-21.

93.    There was no obligation under this CBA for A&P to make a
separate contribution for its retirees.  Trial Tr. Vaccaro
12/11/07 852:1-6.

94.    There is no menu of benefits listed in the A&P Local 1360
contract.  Trial Tr. Vaccaro 12/11/07 848:2-4; P-128.

95.    While retiree benefits were not listed in the A&P-Local
1360 contract, retiree benefits were provided thereunder.  P-125
at TPA0206; Trial Tr. Vaccaro 11/15/07 220:8-22; 263:4-10;
375:20-25; 12/11/07 851:1-13.

96.    Retiree benefits were paid for as a component of the
active employee rate.  Trial Tr. Vaccaro 12/11/07 851:7-13;

852:19-23.

97.    The retiree component was not the direct cost of A&P's own retirees but that an equal share of the total retiree costs for the pool of retirees in the Fund.  Trial Tr. Vaccaro 12/11/07 689:24-690:1; 853:15-25; 5/6/08 1136:10-19.

98.    From the time Local 1360 entered into the CBA with A&P through May of 2003, the Trustees of the Fund only sought, and A&P only paid, monthly contributions based on its three active Local 1360 employees at the Frenchtown store.  Trial Tr. Vaccaro 860:13-17.

99.    The A&P and Local 1360 contained an uncapped MOB provision.  Trial Tr. Vaccaro 11/15/07 211:21-25.

100.    Article 21 also provided that if "the unallocated surplus relative to total expenses be less than six (6) months, the M.O.B. amount will be adjusted to re-establish the unallocated surplus to the equivalent of six (6) months of total expenses." This is commonly referred to as the "Maintenance of Reserves" or "MOR" clause.  P-128 at TPA0637.

101.    The CBA between A&P and Local 1360, at Article 21, provides that "all questions involving Health & Welfare, not specifically set forth herein, shall be determined by the provisions of the Agreement and Declaration of Trust governing the Plan." Stip. Facts at ¶ 30; P-128 at TPA0638.

102.    Where a question is unanswered involving Health & Welfare

in the Local 1360 CBA, requiring reference to the Agreement and Declaration of Trust, decisions made pursuant to the Trust Agreement must still be subject to and consistent with the existent provisions in the CBA.  P-38 at 11, Section 4.1; Trial Tr. Witt 6/12/08 3980:12-24.

103.   Article 24 of the CBA between A&P and Local 1360 addressed the issue of A&P store closings during the term of the CBA.  Stip. Facts at ¶ 69.

104.   Other than a requirement of 20 days advanced notice, Article 24 of the CBA between A&P and Local 1360 contains no restriction upon A&P's right to close its Frenchtown, NJ store for any legal reason. Stip. Facts at ¶ 70.

105.   A&P and Local 1360 executed a Side Letter Agreement to their 2000-2005 CBA, which was made part of the CBA, entitled "Store Closing Provision" ("Side Letter Agreement").  Stip. Facts at ¶ 71.

106.   The Side Letter Agreement between A&P and Local 1360 provides, inter alia:

> In the event the Company closes the existing Frenchtown store and replaces it with a replacement store in Frenchtown or its immediate vicinity, the Company will offer work assignments in the replacement store to the employees of the current store.
>
> In the event the Company closes the existing Frenchtown store, but does not replace it with a replacement store, the company will make its best effort to assign existing Frenchtown store employees to another work location in as close a proximity as possible.  Such a reassignment would be in accordance with the terms of

the prevailing local union's agreement.

Stip. Facts at ¶  72.

107.    This CBA was the only CBA A&P had in the Fund during the time period at issue here.  Trial Tr. Vaccaro 12/11/07 846:22-25.

108.    This CBA imposed no obligations upon A&P to make contributions on behalf of Local 27 or 1358 actives or retirees. Trial Tr. Vaccaro 12/11/07 864:16-865:6; 866:9-9-24.


        ***ii) The Frenchtown Store***

109.    In May 2003, the A&P-Local 1360 CBA covered a bargaining unit employed at a store in Frenchtown, New Jersey.  Stip. Facts at ¶ 43.

110.    The Frenchtown store had 10 employees who were members of Local 1360, three of whom were full-time employees participating in the Plaintiff Fund.  Stip. Facts at ¶ 44.

111.    A&P closed the Frenchtown store on September 30, 2003. Stip. Facts at ¶ 45.

112.    Upon closing its Frenchtown Store, A&P advised the Fund of its opinion that it had no further obligation to contribute to the Fund as its CBA with Local 1360 was terminated.  Stip. Facts at ¶ 46.

113.    Upon closing the Frenchtown store, A&P no longer had any active employees participating in the Fund.  Trial Tr. Vaccaro 12/12/07 1022:8-16; 5/6/08 1140:16-1141:4.

114.     Since the closure of the Frenchtown store, some retirees whose last employer was A&P have continued to participate in the Fund.  Stip. Facts at ¶ 48.

115.     Since the closure of the Frenchtown store, no contributions have been made to the Fund on behalf of those retirees who last worked in an A&P store.  Stip. Facts at ¶ 49.

116.     After the closing of the Frenchtown store, A&P no longer had any obligations to the Fund because it no longer had any viable CBAs in the Fund.  Trial Tr. Vaccaro 12/12/07 1089:2-22; D-385.


**D.   The Funding of Benefits Prior to May 6, 2003**

117.     CBAs between Locals 27, 1358 and 1360 and Super Fresh and between Local 1360 and A&P stated that employers are required to make contributions to the Fund at a dollar rate multiplied by the number of active employees.  D-76 at 25; P-128 at 20, P-129 at 24, P-151 at 25; Trial Tr. Vaccaro 11/14/07 107:22-108:8; 409:3-14; Calleri 5/15/08 2564:3-9.

118.     Retiree benefits were funded through Plans I and H as a component of those plans.  These retiree benefits were not broken out as a separate component.  D-76, P-129, P-129, P-151; Trial Tr. Vaccaro 11/14/07 108:13-21.

119.     Under the "old methodology," retirees were not identified to individual employers but were part of a general "pool" of

retirees in the Fund.  Trial Tr. Vaccaro 11/14/07 112:2-7; 113:9-13; 12/11/07 689:24-690:1; 853:18-25; Camp 6/12/08 3939:11-19; Calleri 5/15/08 2462:23-2463:4.

120.   The menus of benefits in the Super Fresh CBAs with Locals 27, 1358, and 1360 did not represent a contractual obligation on behalf of Super Fresh to provide the specific benefits listed, instead the menu was a list to provide a reference for employees. Trial Tr. Kinney 6/11/08 3684:4-9; Rogers 6/16/08 4324:15-24.

121.   The menu of benefits itself demonstrates that it was not a list of contractual benefits to be provided.  For example, it contained a listing for "reserve factor," meaning the unallocated surplus.  This was not a provided "benefit."  Trial Tr. Calleri 2472:11-20.

122.   The menus of benefits demonstrate that the bargaining parties understood that retiree costs were "pooled" especially as these menus contained items for "administration" - i.e., pooled administrative costs.  Trial Tr. Rogers 6/16/08 4308:3-24.

123.   The cost of retiree benefits each year for the pool of retirees was determined by the Plan administrator and that cost was divided by the active employee population per a formula developed by the Trustees.  Trial Tr. Vaccaro 11/14/07 143:8-14.

124.   The cost of all retirees was spread over all active Plan I and H participants in the Fund irrespective of who their last employer was.  Trial Tr. Vaccaro 11/16/07 450: 18-22; 12/11/07

855:3-25.

125.    When an employer made a contribution per active employee for a full-time participant in Plan I or H, a portion of the contribution was used to provide pooled retiree benefits.  Trial Tr. Vaccaro 11/14/07 109:7-14.

126.    The pooling of retirees was a well-established course of conduct.  Calleri 5/16/08 2825:24-2826:2.

127.    When the Super Fresh contracts with Locals 27, 1358 and 1360 were bargained, the bargaining parties did not intend for Super Fresh to make contributions for its own retirees.  Trial Tr. Vaccaro 5/6/08 1130:15-25.

128.    The calculations used to determine the per active rate were never set forth in the CBAs.  Trial Tr. Vaccaro 12/12/07 925:4-25.

129.    The method for determining the cost of retiree benefits was not set forth in Appendix C of the CBAs with Super Fresh or Article 21 of the A&P CBA with Local 1360.  Trial Tr. Vaccaro 11/14/07 109:18-23; 159:7-12.

130.    The Fund administrator determines the contribution rates set forth in the CBAs at issue, which are approved by the Trustees of the Fund.  Trial Tr. Vaccaro 11/14/07 130:13-20.

131.    The Fund Administrator would determine the increases in benefit costs every year under the applicable MOB provisions. Trial Tr. Vaccaro 131:17-19; P-96.

132.   If the cost of providing benefits increased above the percentage provided for in the CBAs, Super Fresh and A&P were required to pay for that increase pursuant to the uncapped MOB provisions in the CBAs.  Trial Tr. Vaccaro 11/14/07 121:5-11.

133.   If there was a full or uncapped MOB, the employers would have to pay the approved MOB increase no matter how high that percentage increase was.  Trial Tr. Vaccaro 11/16/07 453:8-12.

134.   Where a rate increase went into effect pursuant to an MOB, that rate increase was to be multiplied by the number of active employees only.  Trial Tr. Vaccaro 12/11/07 805:1-22; 828:4-8; 858:17-22.


**E.   The "Methodology Change"**

135.   Beginning in 2002 or thereabouts, a number of events caused a reduction in the number of active employees in the Fund thus altering the ratio of active employees to retirees. Specifically, the Fund suffered the loss of approximately half of its active employee population (declining from 10,000 to fewer than 5,000) because of the withdrawal of several participating employers from the Fund.  Stip. Facts at ¶ 35.

136.   In 2002 and 2003, the Fund Administrator prepared various reports that compared, for each participating employer, the cost of providing benefits to their retirees versus the contributions being paid by each participating employer.  These reports showed

that certain employers were paying more per month for retirees than the costs of their own retirees while some employers were contributing less per month than the costs of their own retirees. Stip. Facts at ¶ 36; Trial Tr. Vaccaro 308:16-309:13.

137.    A&P and Super Fresh were part of that group of employers who were contributing less per month than the costs of their own retirees.  A&P and Super Fresh had greater discrepancies than did the other employer(s) who were contributing less per month than the costs of their own retirees.  Stip. Facts at ¶ 37; P-97 at SF00214.

138.    At a March 10, 2003 meeting of the Fund's Board of Trustees, the Trustees discussed and identified various options to deal with retiree funding and formed a committee to address the issues.  These options ranged from imposing co-pays to separate contributions for retirees.  Stip. Facts at ¶ 38.

139.    During the May 6, 2003 Trustee meeting, a majority of the Trustees voted in favor of a resolution requiring that "all participating employers begin to contribute a specific contribution rate for their retirees" ("the May 6, 2003 Resolution").  The Resolution required all employers participating in Plans I and H, including Defendants A&P and Super Fresh, to make a contribution for each of their eligible retirees.  Stip. Facts at ¶ 39; Trial Tr. Vaccaro 11/16/07 426:10-16; P-140.

140.    One of the employer Trustees, William Moss (an A&P employee), voted in favor of the May 6, 2003 Resolution.  Two other employer Trustees, Clark Sprague and Carmen Messina, also employed by A&P, voted against the May 6, 2003 Resolution.  Stip. Facts at ¶ 40; P-140.

141.    The May 2003 change instituted by the Trustees was a change in the contribution methodology.  Trial Tr. Vaccaro 11/16/07 427:20-428:5; Calleri 5/15/08 2528:8-20.

142.    The adequacy of contributions under the old method was not an issue for the Fund administration.  Instead, the issue that the Fund identified was the inequitable allocation of costs among the employers in the Fund.  Trial Tr. Vaccaro 11/16/07 432:7-15; 441:4-22; 453:13-454:1; 12/10/07 625:3-10; 12/11/07 701:19-22; Calleri 5/7/08 1520:13-22.

143.    Pursuant to this methodology change, each employer was required to make a contribution for each of its active employees and for each of its retirees.  Trial Tr. Vaccaro 11/16/07 427:20-428:5; 12/12/07 976:8-25.

144.    There was no change to the language of any of the relevant CBAs to provide for a per retiree multiplier change in methodology.  Trial Tr. Vaccaro 12/11/07 820:19-24.

145.    There is no provision in any of the CBAs allowing demand for contributions from employers on a per retiree basis.  D-76, P-128, P-129, P-151.

146.    There is no language in the Trust Agreement that allowed the Trustees to change the clear "per active employee" multiplier as the Trust Agreement is clear that the Trustees' duties are to be applied "**subject to and consistent with** the applicable provisions of the then-existing collective bargaining agreements. . . ." P-38 at Sec. 4.1s (emphasis added); Trial Tr. Witt 6/12/08 3977:25-3978:9.

147.    The uncapped MOB provisions contained in the CBAs at issue allowed for an increase in the rate multiplied by the number of active employees.  There is no language in the MOB provisions providing the Trustees with the authority to change the rate multiplier.  Thus, the MOB provisions were not the basis of the change made by the Trustees.  Trial Tr. Vaccaro 12/11/07 805:1-22; Calleri 5/16/08 2816:11-16.

148.    The Maintenance of Reserve provisions of the CBAs permitted the Trustees to take steps to maintain the Fund's reserves and replenish the unallocated surplus.  Trial Tr. Witt 6/13/08 4207:6-4208:2.

149.    Pursuant to a September 2001 resolution, the Trustees limited their right to seek payments under the MOR clauses to the extent set forth in the appendices to the resolution.  Trial Tr. Vaccaro 12/12/07 969:14-22.

150.    The Trustees did not base the change in methodology on the MOR language.  Trial Tr. Vaccaro 12/12/07 957:9-19; Calleri

5/16/08 2816:20-2817:06.

151.    The methodology change that occurred, requiring the
employers to pay not only a rate per active employee but also a
rate per their own retirees, did not constitute a mere change in
how these employers were billed.  Trial Tr. Vaccaro 12/12/07
1001:9-10.

152.    The Trustees had no authority to unilaterally ignore the
clear terms of the CBAs regarding employer contributions.  Trial
Tr. Witt 6/12/08 3973:2-8; Calleri 5/15/08 2567:17-19.

### i) Acquiescence Theory

153.    On June 16, 2003, the Trustees of the Fund were presented
with an MOB report which had been prepared by the Fund's Contract
Administrator.  Pursuant to the Trustees' May 2003 Resolution,
the Administrator's MOB report contained retiree contribution
rates pursuant to the new methodology.  The MOB rates were
unanimously approved by all of the Trustees.  Stip. Facts at ¶
41.

154.    On October 9, 2003, a letter was sent from Sam Wolf, the
bookkeeping manager for the Fund to Kathy Hamilton of Super
Fresh.  This letter recalled several requests for payment and
Super Fresh's failure to remit contributions for its retirees.
This letter states that Super Fresh owed a total of $676,243.28.
P-51.

155.    In an email dated October 14, 2003 from Clark Sprague, A&P's former Director of Trust Management, to Frank Vaccaro, Sprague indicated that checks will be sent soon and that the delay in sending payment was the time it took to identify and validate the names of retirees.  The payment that accompanied this email was for Super Fresh retirees only. P-79; Trial Tr. Vaccaro 12/10/07 504:1-15; 5/6/08 1178:4-20.

156.    Payments were made in an attempt to pay the obligation that existed under the old method.  Trial Tr. Sprague 2997:20-2998:10.

157.    There have never been any payments made for A&P retirees under the new methodology.  Trial Tr. Vaccaro 5/6/08 1178:21-25; Calleri 5/16/08 2761:13-16.

158.    On January 23, 2004, Plaintiffs' counsel Mark E. Belland, Esq. received a letter from Defendants' counsel, Hollis Hurd, Esq., regarding the alleged contribution delinquency.  Mr. Hurd's letter set forth, in detail, the legal and factual bases for Defendants' objections to the Trustees' May 6, 2003 change in methodology as well as their legal defenses to Plaintiffs' related claim for unpaid contributions.  The letter also identified attempts made by Mr. Hurd to contact Mr. Belland beginning on November 12, 2003.  Stip. Facts at ¶ 83.

159.    As of early 2004, it is clear that Super Fresh maintained the position that the change in the methodology was unlawful and

34

in violation of the CBAs.  P-135; Trial Tr. Vaccaro 520:20-11.

160.    Prior to February 10, 2004, the Defendants had only made two payments for retirees.  Trial Tr. Vaccaro 12/10/07 523:10-21.

161.    As of March 3, 2004, Clark Sprague confirmed that Super Fresh had not paid any contributions for retirees and that Super Fresh was making payments based on the old methodology.  P-134; Trial Tr. Vaccaro 12/10/07 533:14-16; 5/6/08 1185:18-21.

162.    From May 2003 onward, Trustees from the Defendant companies voiced their opinions that they were not in favor of the change in methodology.  Trial Tr. Vaccaro 5/6/08 1172:6-17.

163.    The Defendants did not acquiesce in the change by making two payments into the Fund.  Trial Tr. Vaccaro 12/12/07 1009:3-6; 5/6/08 1172:6-17; 1185:18-1186:6; 1206:4-7; P-79; P-134; P-135.


### E. The Move of Local 27 Members

#### i) The Move to Local 56

164.    On March 21, 2003, a "Letter of Understanding" was executed by Clark Sprague and Anthony Cinaglia which provided, inter alia:

> UFCW Local 56 Benefits and Super Fresh "A&P"
>
> This will be to memorialize our understanding of Super Fresh employees (participants) who are in TriState Local 27 moving to United Food & Commercial Workers Local 56 Benefit Fund.
>
> 1.      All employees (Participants) who are covered under the collective bargaining agreement with Local 27 who transferred into the Local 56 Benefit Fund [sic]

the contribution rate would be in accordance with the
collective bargaining agreement which expires in 2004.
There shall be no reduction to the participants and/or
increase to the employer which is not stated in the
collective bargaining agreement.

Stip. Facts at ¶ 51.

165.    At the time the "Letter of Understanding" was executed,

contributions were being made to the Plaintiff Fund for eligible

Local 27 Super Fresh participants based on the number of Super

Fresh's active employees, which active employee rate included the

retiree component (i.e., the "old methodology").

Stip. Facts at ¶ 52.

166.    On April 16, 2003, Super Fresh and Local 27 entered into

an "Addendum" to their existing 1999-2004 CBA which provided, in

pertinent part, as follows:

> SUPER FRESH Food Markets, Inc ("Employer") and the
> United Food and Commercial Workers Union Local 27
> ("Union") hereby agree as follows:
>
> APPENDIX "C", first sentence, will be modified to
> provide:
> 1.        Effective June 1, 2003 the Employer agrees to
> cease participation in the Tri-State Health & Welfare
> Fund, and to begin contributions to the UFCW Local 56
> Health and Welfare Fund. . .
> 2.        The parties agree all of the terms of
> Appendix "C" shall remain the same for the duration of
> the contract.

Stip. Facts at ¶ 53.

167.    At the time Super Fresh and Local 27 signed the Addendum,

the Plaintiff Fund had not yet changed the retiree allocation

methodology (i.e., the "new methodology"), and therefore Super

Fresh had been making contributions to the Plaintiff Fund for Local 27 participants on the basis of its active employees, which active employee rate included the pooled retiree component. Stip. Facts at ¶ 54.

168.    Local 27 Super Fresh employees moved from the Tri-State Fund to the Local 56 Health and Welfare Fund.  That transfer was to become effective on June 1, 2003.  P-62.

169.    Super Fresh retirees were also moved from Local 27 to the Local 56 Fund.  Trial Tr. Vaccaro 12/10/07 541:20-24.

170.    Retirees of A&P that were members of Local 27 were also transferred over to the Local 56 Fund.  P-81 as redacted; P-191 (confidential exhibit); Trial Tr. Vaccaro 12/10/07 541:25-542:1; 545:2-5.

171.    The transfer over to Local 56 also included any Local 27 "orphan" retirees, that is, retirees whose employers no longer existed and that were no longer making contributions to the Fund. P-113 (as redacted); Trial Tr. Vaccaro 11/15/07 326:14-18.


### ii) The Return to the Fund

172.    In October 2004, negotiations commenced for a successor contract between Local 27 and Super Fresh.  These negotiations ultimately resulted in a new "Memorandum of Agreement" or "MOA" signed by Super Fresh and Local 27 on July 27, 2005.  Stip. Facts at ¶ 55.

173.    The MOA memorialized changes or amendments to the Super Fresh and Local 27 CBA.  Terms of the prior agreement, not specifically changed by the MOA, were carried forward.  Trial Tr. Vaccaro 230:4-14; 5/6/08 1276:4-10.

174.    The preamble stating that Super Fresh and A&P are separate entities was carried over in the MOA.  P-47.

175.    A&P was not a party to the MOA.  Trial Tr. Camp 6/12/08 3883:22-23.

176.    Margaret Bohon, the Local 27 representative who was directly involved with the MOA negotiations, was fully aware of the ongoing litigation in this matter as of the end of 2004 - specifically that A&P and Super Fresh were claiming to be separate entities.  Trial Tr. Bohon 4/14/08 2306:20-2306:6.

177.    Bohon was not negotiating on behalf of A&P retirees. Trial Tr. Bohon 5/14/08 2307:3-14.

178.    A&P had not had a CBA with Local 27 for well over 10 years prior to the MOA.  Trial Tr. Bohon 5/14/08 2265:1-13.

179.    Tim Camp, representing Super Fresh in the negotiations, had no authority during the negotiations to make agreements for A&P; Margaret Bohon was aware of this.  Trial Tr. Camp 6/12/08 3862:17-20; Bohon 5/14/08 2261:20-24.

180.    Although signed on July 27, 2005, by its terms the MOA was retroactive to October 31, 2004 and will continue in effect through October 25, 2008.  Stip. Facts at ¶ 56.

38

181.    Among other changes it made to the health and welfare provisions of the Super Fresh/Local 27 1999-2004 CBA, the MOA contained Super Fresh's agreement to transfer "those bargaining unit members currently participating in and/or covered by the UFCW Local 56 Health and Welfare Fund from the latter fund to participation in and coverage by the Tri State Health & Welfare Fund, pending approval of the Trustees, under the same rules and conditions as are other employer participants of the Tri State Health & Welfare Fund."  Stip. Facts at ¶ 61; P-47.

182.    The term "bargaining unit" in the MOA referred to active employees not retirees.  Trial Tr. Witt 6/12/08 4001:6-23; Camp 6/12/08 3859:17-3860:6; Bohon 5/14/08 2290:11-21; Kinney 6/11/08 3597:1-5.

183.    The MOA did not contain an agreement by Super Fresh to pay for current Super Fresh retirees.  Trial Tr. Witt 6/13/08 4064:2-24; Mays 5/13/08 2121:12-19; Kinney 6/11/08 3599:12-17.

184.    The A&P retirees were not included in the MOA.  Trial Tr. Bohon 5/14/08 2337:4-19; Kinney 6/11/08 3597:10-13; 3598:7-10.

185.    In response to the position that Super Fresh took regarding an "actives only transfer" pursuant to the MOA, there was a strike threat by the unions.  Trial Tr. Mays 5/13/08 2108:10-23.

186.    Local 27 representatives were passionate about the return of retirees to the Fund but did not distinguish between A&P and

39

Super Fresh retirees.  Trial Tr. Camp 6/12/08 3865:4-6 & 3869:7-12.

187.    During the Camp-Bohon pre-ratification discussion regarding the MOA, A&P retirees were not specifically mentioned. Trial Tr. Bohon 5/14/08 2375:20-2376:3; Camp 6/12/08 3868:20-3869:7-12.

188.    Tim Camp spoke to Margaret Bohon on the day of ratification and assured her that the move would include retirees.  He never said anything about A&P retirees specifically.  Trial Tr. Camp 6/12/08 3868:20-3869:4; Bohon 5/14/08:2376:1-3.

189.    Camp never agreed to specifically transfer back the A&P retirees.  Trial Tr. Camp 6/12/08 3873:24-3874:3; Bohon 5/14/08 2375:22-2376:13.

190.    Bohon assumed that A&P retirees were part of the transfer deal.  Trial Tr. Bohon 5/14/08 2375:22-2376:13.

191.    The September 27, 2005 letter purportedly signed by Tim Camp, was not signed by him, though he had knowledge of its contents.  Trial Tr. Camp 6/12/08 3877:1-21; P-93.

192.    This letter confirmed the commitment to abide by the MOA. P-93.

193.    It is unclear who authored this letter or why the name A&P appears in the first line.  Trial Tr. Camp 6/12/08 3878:11-13.

194.    After the MOA was signed, Super Fresh agreed to pay pursuant to the new methodology for Super Fresh retirees.  Trial Tr. Witt 6/12/08 4003:8-21; Camp 6/12/08 3924:6-10.

195.    The Fund Trustees required more than the MOA itself; they required a document to clarify which participants in the Local 56 Fund would be transferred back and to ensure that anyone who was coming back to the Fund would be paid for.  Trial Tr. Witt 6/13/08 4090:11-20; String 5/12/08 1893:18-25; Calleri 5/16/08 2796:4-20.

196.    At the request of the Trustees, the agreement to transfer was memorialized in a Participation Agreement.  Trial Tr. String 5/12/08 1893:18-25; Witt 6/13/08 4066:13-17; 4092:10-13.

197.    There were several drafts of the Participation Agreement that went back and forth between Local 27 representatives and Super Fresh.  Trial Tr. Camp 6/12/08 3886:12-15; Witt 6/13/08 4085:7-11.

198.    One draft of the proposed agreement, sent by the Trustees, specifically referenced A&P.  This draft was not executed.  Trial Tr. Witt 6/13/08 4118:21-25; 4121:5-12.

199.    Super Fresh returned a draft to the Trustees explicitly excluding A&P.  Trial Tr. String 5/12/08 1899:23-25; Witt 6/13/08 4122:7-15.

200.    During an October 27, 2005 meeting the Trustees considered a Participation Agreement with respect to the transfer

41

of the Local 27 participants back to the Plaintiff Fund.  Stip.
Facts at ¶ 63; P-70.

201.    During this meeting, it was Super Fresh's intent that the
transfer pertain to Super Fresh actives and retirees (both
present and future).  P-70; Trial Tr. Witt 6/13/08 4132:16-22.

202.    At this meeting, the Board of Trustees adopted the
Participation Agreement. P-70.

203.    The executed Participation Agreement provides, inter
alia:

> WHEREAS, Super Fresh Food Markets, Inc. (the
> "Employer") has agreed to participate in the United
> Food and Commercial Workers Union and Participating
> Food Industry Employers Tri-State Health and Welfare
> Fund in order to obtain Health and Welfare benefits for
> employees represented by the Union and employer by the
> employer
>                     *     *     *
> The Employer also agrees, effective October 1, 2005, to
> abide by the Resolution adopted by the Trustees of the
> Fund on May 6, 2003 requiring the Employer to
> contribute a specific contribution rate for each of the
> Employer's retirees as such resolution would apply to
> participants who are present or former members of Local
> 27 and:  (1) are presently receiving benefits under the
> UFCW Local 56 Health and Welfare Fund or (2) retire on
> or after October 1, 2005.
>                     *     *     *
> [N]othing in this Participation Agreement shall be
> construed or interpreted as having any effect on, as
> being inconsistent with, or as in any way prejudicing
> the claims or defenses of any Defendant or the Fund in
> the litigation captioned United Food and Commercial
> Workers Union and Participating Food Industry and
> Employers Tri-State Health and Welfare Fund et al v.
> Super Fresh Food Markets, Inc. et al, DNJ Civil Action
> No. 04-01226 (FLW) (the "Retiree Collection Action").
> Stip. Facts at ¶ 64; P-92.

204.    The Participation Agreement clearly defines the employer as Super Fresh only; there is no mention of A&P or its retirees. P-92.

205.    At the time of this Agreement it was clear to the parties that Super Fresh and A&P were denying that they were a single entity.  Trial Tr. Vaccaro 5/6/08 1266:8-21; Witt 6/13/08 4095:13-20.

206.    The series of drafts leading up to this final version confirm that the parties agreed only to transfer the Super Fresh retirees.  Trial Tr. Vaccaro 5/6/08 1289:3-10; Witt 6/13/08 4088:1-6.

207.    After executing the new Participation Agreement, Super Fresh has remitted contributions for Local 27 retirees who were last employed at a Super Fresh store.  Stip. Facts at ¶ 65. Trial Tr. Vaccaro 12/10/07 590:5-13.

208.    Defendants have not made any contributions for Local 27 retirees who were last employed at an A&P store. Stip. Facts at ¶ 66; Trial Tr. Vaccaro 12/10/07 590:5-13.

209.    Per the express terms of the executed Participation Agreement regarding the return of Local 27, Super Fresh did not agree to bring back and pay for retirees formerly employed by A&P.  Trial Tr. Vaccaro 5/6/08 1303:19-25; Witt 6/12/08 3997:5-7; 6/13/08 4128:7-10; Bohon 2371:9-25.

**II.  <u>Conclusions of Law</u>**

**A) General Law, Ambiguity and Interpretation**

1.    The Fund is a third party beneficiary of the relevant CBAs. Agathos v. Starlite Motel, 977 F.2d 1500, 1505 (3d Cir. 1992).

2.    "Whether a collective bargaining agreement or other plan document is clear or ambiguous is a question of law." UAW, Local No. 1697 v. Skinner Engine Co., 188 F.3d 130, 142 (3d Cir. 1999). The central issues in this matter involve the meaning and proper interpretation of the operative contracts, i.e, the Trust Agreement; the CBAs between Super Fresh and Locals 27, 1358, 1360; the CBA between A&P and Local 1360; the Memorandum of Agreement between Local 27 and Super Fresh; and, finally, the Participation Agreement entered into between Super Fresh and Local 27.

3.    In determining whether a collective bargaining agreement is ambiguous, the Court must do more than determine if the language in the document is clear on its face; it should consider "the contract language, the meanings suggested by counsel, and the extrinsic evidence offered in support of each interpretation." Teamsters Industrial Employees Welfare Fund v. Rolls-Royce Motor Cars, Inc., 989 F. 2d 132, 135 (3d Cir. 1993); Heffron v. Adamar of New Jersey, 270 F. Supp. 2d 562, 570-71 (D.N.J. 2003)("it may be appropriate to consider extrinsic evidence even when the language of a particular clause or provision in a contract appears on its face to be free from ambiguity.").

44

4.    Relevant extrinsic evidence "may include the structure of the contract, the bargaining history, and the conduct of the parties that reflects their understanding of the contract's meaning." Teamsters Industrial, 989 F.2d at 135; see Heffron, 270 F. Supp. 2d at 571 (looking to the "course of dealing" between the parties to a CBA).

5.    "[E]xtrinsic evidence of the negotiations, conduct and other circumstances of the parties is important to a court's analysis of whether an agreement is ambiguous only to the extent, if any, that such evidence provides 'objective indicia that, from the linguistic reference point of the parties, the terms of the contract are susceptible of different meanings.'" American Cyanamid Co. v. Fermenta Animal Health Co., 54 F.3d 177, 181 (3d Cir. 1995) (quoting Mellon Bank, N.A. v. Aetna Business Credit, Inc., 619 F.2d 1001, 1011 (3d Cir. 1980)).

6.    "The focus must remain on the language chosen by the parties, and a text unambiguous when accorded the commonly understood meaning of its words cannot be disregarded unless the extrinsic evidence is such as might cause a reasonable fact finder to understand the text differently." American Cyanamid, 54 F.3d at 182. See Local 827 IBEW v. Verizon N.J., Inc., 192 Fed. Appx. 132, 138 (3d Cir. Aug. 9, 2006) ("extrinsic evidence is only useful insofar as it illuminates the parties' understanding of the contractual language . . . .").

7.    "To interpret an ambiguous contractual provision, a fact-finder must attempt to discover what the contracting parties . . . intended the clause to mean." Teamsters Industrial, 989 F.2d at 136.

8.    "The past dealings of contracting parties pursuant to an agreement are probative of the parties' intent." Teamsters Industrial, 989 F.2d at 137.


*C) The Trust and the Relevant the CBA Provisions*

9.    The CBAs between Super Fresh and Locals 27, 1358 and 1360 and the CBA between A&P and Local 1360 are textually ambiguous as to whether or not retiree benefits would be provided thereunder. While the text of the CBAs does not specifically state that retiree benefits will be provided, the Super Fresh CBAs contain references to specific "retiree" benefits in the menu of benefits.  The A&P CBA contains no such menu.

10.    The extrinsic evidence offered by the parties, including the past dealings and conduct of the parties to the CBAs, reflect the understanding that retiree benefits would indeed be provided thereunder.  See Teamsters Industrial, 989 F.2d at 137.

11.    The extrinsic evidence offered by the parties, including the past dealings and conduct of the parties to the CBAs also reflect that the costs of retiree benefits would be pooled among all the employers in the Fund.

46

12.    While the "pooling" method of allocating retiree benefit costs was not an explicit provision in the CBAs, that was the longstanding method of allocating the costs of such benefits and what the parties intended when they bargained the CBAs. Cruz-Martinez v. Dep't of Homeland Sec., 410 F.3d 1366, 1370 (Fed. Cir. 2005) ("Clear and long-standing practices of the parties--in other words, 'past practices' – can establish terms of the agreement that are as binding as any specific written provision.").

13.    The parties only bargained over pooled costs of retirees benefits.

14.    The extrinsic evidence and course of conduct demonstrates that a per retiree contribution was neither the intent nor expectation of the parties.  Teamsters Industrial, 989 F.2d at 135; see Heffron, 270 F. Supp. 2d at 571.

15.    The menus of benefits contained in the Super Fresh CBAs do not constitute a contractual obligation on behalf of Super Fresh to specifically contribute for Super Fresh retirees on a per retiree basis.

16.    The term "eligible associate" used in Article 25 of the Super Fresh CBAs unambiguously refers to active employees, and the extrinsic evidence offered by the parties, particularly the course of conduct, reveals no "'objective indicia that, from the linguistic reference point of the parties, the terms of the

47

contract are susceptible of different meanings.'" American Cyanamid Co., 54 F.3d at 181 (quoting Mellon Bank, N.A., 619 F.2d at 1011).

17.   The employers' obligation under the relevant CBAs to pay for health and welfare benefits (including retiree benefits known to be part of the contribution based on course of dealing) is clear and unambiguous: per the language in the CBAs, the employers, Super Fresh and A&P, were required to make a contribution at a specified rate (which included the cost for pooled retiree benefit costs) **per each "employee**," meaning active employee.  The extrinsic evidence offered by the parties only confirms this understanding and will not be used to insert ambiguity where none exists.  See American Cyanamid, 54 F.3d at 182 ("the focus must remain on the language chosen by the parties, and a text unambiguous when accorded the commonly understood meaning of its words cannot be disregarded unless the extrinsic evidence is such as might cause a reasonable fact finder to understand the text differently.").

18.   The MOB clauses in the CBAs are unambiguous: they only give the Trustees the power to increase the contribution rate if those rates are **insufficient to fund the required contributions**.

19.   Section 4.1 of the Trust document makes clear that the powers and duties of the Trustees are to be "subject to and consistent with the applicable provisions of the then existing

48

collective bargaining agreements." This language manifests an intent that the provisions of the CBA should prevail and that any rules or policies implemented by the Trustees (which are, indeed, binding on the parties per 4.1s) must conform thereto. See New York State Teamsters Conference Pension and Retirement Fund, v. United Parcel Service, Inc., 382 F.3d 272, 274 (2d Cir. 2004) ("the rulemaking authority of a multiemployer benefit plan is limited by the terms of its creation documents."); Cf., Central Pennsylvania Teamsters Pension Fund v. W&L Sales, Inc., 778 F. Supp. 820, 829 (E.D. Pa. 1991)(noting that provisions of the trust prevailed where there was no intent that the provisions of the collective bargaining agreement should dominate); Banta Corp., v. Graphic Communications Int'l Union Upper Midwest, No. 04-1022, 2006 U.S. Dist. LEXIS 853, at *21 (D. Minn. Jan. 6, 2006)(denying summary judgment where there was arguably an intent that the provisions of the CBA prevail over the terms of the Trust and, thus, the logic employed in W&L Sales would not apply).

20.    The CBAs at issue are not the "supplementary or amendatory documents" as referred to in Section 4.1s. When the Trust document refers to collective bargaining agreements, it does so directly and specifically says collective bargaining agreements in the heading section of 4.1. The Trustees must read the heading section of 4.1 in conjunction with 4.1s. See Engelhard

<u>Corp. v. NLRB</u>, 437 F.3d 374, 381 (3d Cir. 2006) (discussing the
importance of context and reading contract provisions together to
formulate a harmonious whole).

21.   The cases cited by Plaintiffs in support of their
contention that the Trustees retain total discretion, even if the
governing Trust documents state that contributions are to be made
pursuant to CBAs, are distinguishable.  See <u>Bakery and Confection
Union and Industry Int'l Pension Fund v. Ralph's Grocery Co.</u>, 118
F.3d 1018, 1026 (4th Cir. 1997)(finding that the language
"subject to the Collective Bargaining Agreement" grammatically
modified the term "employee" and did not subordinate the
contribution required to the terms or conditions set forth in
other parts of the CBA and that it conflicted with an integration
clause); <u>Trustees of the Graphic Communications International
Union Local 1B Health and Welfare Fund v. Tension Envelope Corp.</u>,
No. 02-1818, 2003 U.S. Dist. LEXIS 4647 (D. Minn. Mar. 24,
2003)(noting that there was no expression of an intent that the
provisions of the CBA prevail over the terms of the Trust and
that the side letter at issue "expressly subjugates itself to the
Trust Agreement. . . ."); <u>W&L Sales, Inc.</u>, 778 F. Supp. at 829
(finding that the provisions of the trust prevailed where there
was no intent that the provisions of the collective bargaining
agreement should dominate).

### D) The Methodology Change

22.   ERISA requires participating employers to make contributions in accordance with the terms of the multiemployer plan or terms of the CBA but does not specify how to resolve a conflict between the two.  <u>New York State Teamsters Conference Pension and Retirement Fund, v. United Parcel Service, Inc.</u>, 382 F.3d 272, 279 (2d Cir. 2004).  An "[i]nterpretation of the parties' agreements requires an initial determination as to which contracts control."  <u>Banta Corp., v. Graphic Communications Int'l Union</u>, No. 04-1022, 2006 U.S. Dist. LEXIS 853 at * 14 (D. Minn. Jan. 6, 2006).

23.   As discussed above, Section 4.1 of the Trust Agreement makes clear that the powers and duties of the Trustees are to be "subject to and consistent with the applicable provisions of the then existing collective bargaining agreements."  This language manifests an intent that the provisions of the CBA should prevail.  <u>See</u> <u>New York State Teamsters</u>, 382 F.3d at 274; <u>Banta Corp.</u>, No. 04-1022, 2006 U.S. Dist. LEXIS 853 at * 21.

24.   The Trustees were without authority to make the methodology change based on the provisions of the Trust Agreement.  The change contradicts the written provisions of the applicable CBAs despite the Trust Agreement's proviso that the rules and regulations adopted by the Trustees must be subject to and consistent with the CBAs.  <u>New York State Teamsters</u>, 382 F.3d

51

at 274.

25.   The Trustees cannot rely on the provisions of the CBA granting the Trustees the authority to resolve unanswered questions because the required contribution method is clearly set forth in the CBA.

26.   While the CBAs may have allowed the Trustees to increase the rate per active employee via the MOB provisions if the funds were insufficient, the CBAs clearly stated that the employer would be obligated to pay the established rate per each active employee.   The Trustees could not alter the explicitly stated portion of the contribution obligation that was collectively bargained.   NLRB v. Amax Coal Co., 453 U.S. at 336.

27.   The Trustees did not and could not base the methodology change on the MOR clauses in the CBAs.   The 2001 Resolution limited the payments that could be sought pursuant to that provision.   Moreover, as stated above, the Trustees could only increase the rate per active employee via the MOB provisions if the funds were insufficient and the MOR relies on a permissible increase of the MOB rate.

28.   The change in methodology calls on the Defendants to make contributions to the Fund that are inconsistent with the CBAs and the Trust Agreement and is, therefore, inconsistent with ERISA Section 515.   29 U.S.C. § 1145 ("Every employer who is obligated to make contributions to a multiemployer plan under the terms of

52

the plan or under the terms of a collectively bargained agreement shall, to the extent not inconsistent with law, make such contributions in accordance with the terms and conditions of such plan or such agreement."); <u>Laborers Health and Welfare Trust Fund for Northern California v. Advanced Lightweight Concrete Co., Inc.</u>, 484 U.S. 539, 548 (1988)(holding that the remedy provided in Sections 1145 and 1132(g)(2) of ERISA is limited to contractual, "promised contributions.").

29.   While retiree benefits are a permissible subject of collective bargaining, <u>see</u> <u>Allied Chemical Alkali Workers of America Local Union No. 1. v. Pittsburgh Plate Glass Co.</u>, 404 U.S. 157 (1971), contributions to a health and welfare fund constitute mandatory subjects of collective bargaining.  <u>See</u> <u>Professional Administrators Ltd., v. Kopper-Glo Fuel, Inc.</u>, 819 F.2d 639 (6th Cir. 1987).

30.   Contrary to federal labor policy, the unilateral change to the employers' contribution requirement to the Fund, as implemented by the Trustees, changed the manner of the contribution set forth in the CBAs without resorting to the collective bargaining process.  <u>Professional Administrators Ltd.</u>, 819 F.2d at 643 (discussing the obligation to bargain collectively established by Section 301 of the Labor Management Relations Act and holding that "[t]he amounts to be contributed by an employer to a trust fund are a matter for collective

bargaining"); see NLRB v. Amax Coal Co., 453 U.S. 322, 336
(1981)(finding that fund trustees "can neither require employer
contributions not required by the original collectively bargained
contract, nor compromise the claims of the union or the employer
with regard to the latter's contributions.").

31.    Defendants did not acquiescence to the change in
methodology.  Defendants voiced unequivocal objections to the
change soon after the change.  See Agathos v. Starlite Motel, 977
F.2d 1500, 1509 (3d Cir. 1992)(stating that acquiescence rule
applies where "an agreement involves repeated occasions for
performance by either party with knowledge of the nature of the
performance and opportunity for objection to it by the
other.")(quoting Restatement (Second) of Contracts § 202(4)); see
Operating Engineers Local 139 Health Benefit Fund, v. Gustafson
Construction Corp., 258 F.3d 645 (7th Cir. 2001) (finding
acquiescence where made payments over a four year period); Turner
v. City of Philadelphia, 96 F. Supp. 2d 460, 463 (E.D. Pa.
2000)(noting that acquiescence occurred over a long period of
time).

32.    With the exception of the 2005 MOA between Super Fresh and
Local 27, Super Fresh is not required to make contributions to
the Fund based upon a per retiree (whose last employer was Super
Fresh) calculation.

33.    When A&P closed its Frenchtown store on September 30,

2003, it no longer had any active employees in the Fund.  Because the methodology change was impermissible, A&P was no longer required to make contributions to the Fund pursuant to its CBA with Local 1360, which required a per active employee contribution only.  <u>Professional Administrators Ltd.</u>, 819 F.2d at 643; <u>see</u> <u>NLRB v. Amax Coal Co.</u>, 453 U.S. 322, 336 (1981).[4]

34.    Because this Court has determined that Plaintiffs are not entitled to contributions based on the new methodology for the aforementioned reasons, it need not reach Defendants' additional "Taft-Hartley", 29 U.S.C. § 186, defense.  <u>See e.g.</u>, <u>American Banana Co., v. Republic National Bank of N.Y.</u>, 362 F.3d 33, 49 n.7 (stating that it did not need to reach other defenses where defendants statute of frauds defense was successful); <u>Green v. Bd. of County Comm'rs. of the County of Haskell</u>, 450 F. Supp. 2d 1273, 1296 (E.D. Okla. 2006).


**E) Local 27 and Transfer of Retirees Back to the Fund**

35.    A&P retirees are not members of the Super Fresh-Local 27 bargaining unit.

36.    Super Fresh could not bargain for the return of Local 27 retirees that were former A&P employees because they are outside of the bargaining unit.  29 U.S.C. 159(a); <u>see</u> <u>Allied Chem. &</u>

---

[4] Plaintiffs do not allege a withdrawal liability claim as to A&P.  Trial Tr. Belland 5/13/08 1987:6-16.

<u>Alkali Workers, Local Union No. 1 v. Pittsburgh Plate Glass Co.</u>,
404 U.S. 157, 181 n. 20 (1971) (stating that a union is not
required to "affirmatively to represent nonbargaining unit
members or to take into account their interests in making bona
fide economic decisions in behalf of those whom it does
represent.").

### i) THE MOA

37.    The language of the MOA refers to a transfer of
"bargaining unit members."   Generally, the term "bargaining
unit" does not include retirees.  <u>Allied Chem.</u>, 404 U.S. at 181
n. 20 ("Since retirees are not members of the bargaining unit,
the bargaining agent is under no statutory duty to represent them
in negotiations with the employer.").

38.    While the plain language of the MOA does not contain
language regarding payment for retirees, the extrinsic evidence
presented by the parties, specifically the pre-ratification
discussions, reveal that Super Fresh agreed to pay for its own
retirees and made no specific promise to pay for retirees
formerly employed by A&P.  <u>See Teamsters Indus.</u>, 989 F.2d at 136.
The conduct of the Trustees in requiring a Participation
Agreement clarifying the MOA only confirms this.

39.    Despite Plaintiffs' arguments to the contrary, the
Separateness Preamble, carried over in the MOA, when combined

56

with the extrinsic evidence, demonstrates that Super Fresh did not agree to pay for A&P retirees.

### ii) The Participation Agreement

40.     The language of the Participation Agreement and extrinsic evidence set forth by the parties (including the explicit rejection of an agreement that included the term "A&P"), shows that the Agreement is unambiguous: the Employer is Super Fresh and, pursuant to the Participation Agreement, Super Fresh must only make contributions to the Fund for its own retirees – i.e., retirees formerly employed by Super Fresh. American Cyanamid, 54 F.3d at 182. See Local 827 IBEW, 192 Fed. Appx. at 138).

41.     Even if this Court were to find the Participation Agreement ambiguous, the extrinsic evidence set forth by the parties, especially the awareness by both parties that A&P and Super Fresh were asserting that they were separate entities, reveals that Super Fresh did not agree to transfer and pay for retirees formerly employed by A&P (which makes sense in light of the instant litigation, initiated prior to the execution of the Agreement). See American Cyanamid Co., 54 F.3d at 186 ("the extrinsic evidence confirms that according the terms of the agreements their plain meaning makes commercial sense.").

42.     Pursuant to the Participation Agreement, the Trustees cannot demand that Super Fresh pay per retiree for retirees

formerly employed by A&P.

**_Conclusion:_**

43.    For the factual reasons stated above and the legal
conclusions drawn therefrom, this Court finds in favor of the
Defendants on the liability issues presented during this bench
trial: the methodology change was impermissible and Super Fresh
did not promise to pay for Local 27 retirees formerly employed by
A&P.

44.    Because the methodology change was impermissible, this Court
need not reach the issue of A&P and Super Fresh's entity status.


Dated:  August 19, 2008                    s/Renée Marie Bumb
                                           RENÉE MARIE BUMB
                                           UNITED STATES DISTRICT JUDGE